UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.D., a minor, by and through his Guardian Ad Litem, Michelle Dougherty,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>ATASCADERO UNIFIED SCHOOL DISTRICT,<br><br>　　　　　　　Defendant. | Case No. 2:22-cv-05937-MCS-AGR<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

　　　Plaintiff C.D. is a minor who filed this action by and through his guardian ad litem Michelle Dougherty seeking judicial review of Defendant Atascadero Unified School District's decision to remove C.D. from his individual education plan ("IEP") placement for more than ten days and the subsequent "[d]ecision rendered by California's Office of Administrative Hearings [("OAH")]" pursuant to the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1415.  (Compl. ¶¶ 1–2, ECF No. 1.)  The parties elected to submit to a bench trial on a stipulated record.  (*See* J. Rule 26(f) Rep. 6–7, ECF No. 18.)  Plaintiff filed a trial brief.  (Pl.'s Br., ECF No. 28.)

Defendant filed an opposing brief, (Def.'s Br., ECF No. 31), and Plaintiff replied, (Pl.'s Reply, ECF No. 33.) The parties simultaneously filed their proposed findings of facts and conclusions of law. (Pl.'s Proposed Findings, ECF No. 41; Def.'s Proposed Findings, ECF No. 42.) The Court deems this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I. FINDINGS OF FACT

Plaintiff C.D. has been diagnosed with several mental health conditions that affect C.D.'s behavior. These include

> Speech-Language Disorder (indicated by deficits in receptive and expressive language), Central Auditory Processing Disorder (indicated by deficits in temporal processing, binaural integration, and auditory sequencing), Borderline Intellectual Functioning (indicated by deficits in comprehension knowledge, fluid reasoning, long-term storage and retrieval, short-term working memory, visual processing, auditory processing, and processing speed), Attention Deficit/Hyperactivity Disorder-Combined Type [("ADHD")] (indicated by difficulties with attentional and behavioral control and executive functioning), and Asthma.

(AR 341, ECF No. 24-1.)[1] As a result of these conditions, C.D. has difficulty managing his frustration or anger, which are correlated with C.D.'s communication difficulties. (*Id.* at 173.) C.D.'s "cognitive profile, learning deficits and ADHD seriously impact his ability for learning and adversely influence problematic behavior." (*Id.* at 174.)

---

[1] The administrative record ("AR") is 2,324 pages long and has been filed as three separate documents. The first part (ECF No. 24-1) comprises pages 1–475, the second (ECF No. 24-2) comprises pages 476–678, and the third (ECF No. 24-3) comprises pages 679–2324. In this Order, pinpoint citations refer to the AR as if it were a single document.

At the time of the incident described below, C.D. was sixteen years old and in ninth grade at Atascadero High School. (AR 7, 53.) On May 3, 2022, C.D. refused to return to class after lunch because he was watching construction work taking place nearby. (*Id.* at 301.) When Rob Robertson, a teacher at the school, told C.D. to move a safe distance from the construction, C.D. responded by saying, "You are not the boss of me." (*Id.* (internal quotation marks omitted).) After C.D. refused to comply with Mr. Robertson's request, C.D.'s special circumstances instructional aide Stacy Steck asked him to move away from the construction site after noticing that "large rocks and chunks of wood were flying over the fenced area due to the large tree stump the construction crew was attempting to remove." (*Id.* at 302.) C.D. "continued to ignore requests to move back" or "use a [behavior intervention plan ("BIP")] strategy" such as going to the break room, or taking breaths. (*Id.*) Although C.D. refused to move away from the construction or return to class, he "put on his glasses and said that was safer." (*Id.*) School officials were notified. (*Id.* at 298.)

When Ms. Steck went on break, Ashley Hale, C.D.'s English teacher and case manager, came over to relieve Ms. Streck. (*Id.*) Ms. Hale followed C.D.'s BIP, adopting "an empathetic response with prompting a choice to a safer area," and reminded C.D. that he was "red."[2] (*Id.* at 298.) C.D. responded by stating, "[Y]ou can't tell me what to do, I don't care if I get hurt." (*Id.* (internal quotation marks omitted).) Ms. Hale gave C.D. "space and used [a] strategy of think aloud modeling for moving to a safer area to keep safe," saying things like, "I'm feeling unsafe because debris is flying through the fence" and "I'm going to step over here to a safer area." (*Id.* (internal quotation marks omitted).) Ms. Hale again notified the school's administration of the

---

[2] C.D.'s BIP included procedures to address inappropriate conduct "such as off task behavior, verbal aggression, physical aggression, and elopement." (AR 777; *see also id.* at 1437–38.) "Atascadero used a green, yellow, and red behavior tracking system that delineated specific procedures for staff to take when" C.D. exhibited certain behavior. (*Id.* at 777.)

situation and called the school nurse to request that C.D. be offered his medication. (*Id.*) A few minutes later, the school nurse arrived and prompted C.D. to take his medication. (*Id.*) When C.D. refused, the nurse gave him space. (*Id.*)

Ms. Hale then approached C.D. and "provided an empathetic response," saying, "[I]t looks like something is bothering you. I'm here to help you"; reminded C.D. he was in "red;" and prompted him to make "safe choices" such as going to the "break room or watching construction area from a safe distance." (*Id.*) C.D. responded that he "was refusing to make a choice and that there is nothing upsetting him." (*Id.*) At that point, C.D. walked behind Ms. Hale reached into her back pocket, took out a pen, and patted her on the buttocks. (*Id.*) Ms. Hale addressed C.D. "and labeled the inappropriate behavior and prompted him to take a break." (*Id.*) C.D. responded by saying, "Fuck you Ms. Hale, you are mean, and a bitch," and postured as if to stab Ms. Hale with a stick he was holding. (*Id.* (internal quotation marks omitted).)

Ms. Steck, who at this point had returned from her break, "respectfully asked [C.D.] to not touch [Ms. Hale] again," (*id.*), and reminded C.D. that it was time "for him to take his meds and acknowledged that this would be a good time to walk around and regroup," (*id.* at 292). C.D. refused and "stated 'Fuck this school, I wish I could blow it up' and started heading down the frontage road toward the direction of the office." (*Id.*) As C.D. walked away, Dan Andrus, the school's principal, arrived. (*Id.*) C.D. "told him to 'fuck off'" and "told him not to talk to [C.D.], and to not tell [C.D.] what to do." (*Id.*) Mr. Andrus told C.D. "that if he could not get back to green and comply, his mom would need to pick him up." (*Id.*) C.D. again swore at Mr. Andrus and returned to the construction area. (*Id.*)

Ms. Steck then asked C.D. "to use a [BIP] strategy so he could go take his meds. [C.D.] briefly stopped, took some breaths, and [Ms. Steck] encouraged [C.D.] to continue to make good choices." (*Id.*) C.D. then "turned back around and walked quickly towards the office." (*Id.*) While C.D. was walking towards the office, the school staff "gave him space." (*Id.* at 302.) The office had multiple hallways, and Ms.

4

Hale and Aly Allison, Atascadero's Board Certified Behavior Analyst ("BCBA"), positioned themselves so C.D. could access the nurse's office but would be unable to enter the administrative offices. (*Id.* at 272, 298.) Ms. Hale was following C.D. at a distance of approximately three feet when C.D. "suddenly" and "quickly walked backward and forcefully pushed his back, with his backpack on, against the front of [Ms. Hale's] body, pushing [her] into the wall." (*Id.* at 298.) Ms. Hale was pinned between C.D.'s backpack and the wall. (*Id.*) Ms. Hale let C.D. "know that the behavior was not safe and requested that he please stop. [C.D.] responded with a raised voice" and stated, "[L]et's go Mrs. Hale, let's do this." (*Id.* (internal quotation marks omitted).) Before Ms. Hale could step away, C.D. again pushed her against the wall using his backpack for a second time. (*Id.*) Following the incident, C.D. went into the nurse's office and took his medicine. (*Id.* at 289, 1415.)

Mr. Andrus, the school principal, suspended C.D. for a total of five days. (*Id.* at 307.) Mr. Andrus then extended the suspension "pending final action of the Board concerning [the] incident." (*Id.* at 311.) On May 9, 2022, Mr. Andrus recommended that C.D. be expelled. (*Id.*) On May 19, 2022, within ten days of Mr. Andrus' expulsion recommendation, the District held a Manifestation Determination ("MD") meeting, where it was determined that C.D.'s conduct was not caused by, and did not have a direct and substantial relationship to, C.D.'s disabilities, nor were the incidents a direct result of the District's failure to implement C.D.'s IEP. (*Id.* at 340–42.) C.D.'s "physical aggression was the only conduct alleged to violate the school code of conduct at the manifestation determination meeting." (*Id.* at 760.) After the school year ended, on June 3, 2022, the District rescinded C.D.'s expulsion, but the suspension still remains on his record. (*Id.* at 370.) From the time C.D. was initially suspended to the time his expulsion was rescinded, he missed a total of 22 days of school. During this period, C.D. was in a placement outside of his IEP.

C.D.'s parents requested a due process hearing based on their disagreement with the District's conclusion at the MD meeting. (*Id.* at 6–9.) Administrative Law Judge

Cynthia C. Fritz ("ALJ") heard the matter via videoconference on July 12–14 and 19–22, 2022. (*Id.* at 754.) The ALJ concluded that C.D. failed to prove that his conduct was caused by, or had a direct or substantial relationship to, his disabilities. (*Id.* at 784.) The ALJ also concluded that C.D. did not provide sufficient evidence to conclude the District failed to properly implement his IEP. (*Id.*)

## II. CONCLUSIONS OF LAW

### A. Legal Framework and Standard of Review

The Court in *School Board of the City of Norfolk v. Brown*, 769 F. Supp. 2d 928, 945–46 (E.D. Va. 2010), succinctly outlined the basic framework of the IDEA as follows:

> Pursuant to the IDEA, school personnel may remove a disabled student who has violated a code of conduct from his current educational setting under limited circumstances. Where school personnel intend to place the disabled child in an alternative educational setting for a period of more than ten school days [i.e., suspend or expel the student, as was the case here], the school must first determine that the student's behavior was not a manifestation of his disability. *See* 20 U.S.C. § 1415(k)(1)(C). In conducting this inquiry, within ten days of any decision to change the student's placement, the local educational agency, the parent, and relevant members of the student[']s IEP team (collectively, the "MDR team") shall "review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—(I) if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or (II) if the conduct in question was the direct

|   |   |
|---|---|
| 1 | result of the local educational agency's failure to implement |
| 2 | the IEP." [*Id.*] § 1415(k)(1)(E)(i). Where the MDR team |
| 3 | answers either of the above inquiries in the affirmative, the |
| 4 | student's conduct shall be determined to be a manifestation of |
| 5 | his or her disability and the student shall be returned to the |
| 6 | educational placement from which he or she was removed. |
| 7 | [*Id.* ]§ 1415(k)(1)(E)(i), 1415(k)(1)(F)(iii). |

Parties have the right to appeal the findings of an ALJ "in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(*i*)(2)(A). On appeal to a district court, the party challenging the administrative decision bears the burden of proof by a preponderance of the evidence that relief is appropriate. *Newport-Mesa Unified Sch. Dist. v. D.A.*, No. 8:20-cv-01857-SPG-JEM, 2023 WL 2977500, at *4–5 (C.D. Cal. Apr. 3, 2023) (citing, inter alia, 20 U.S.C. § 1415(*i*)(2)(c)).

The Ninth Circuit has "construed section 1415(*i*)(2)(C) as calling for de novo review of the state hearing officer's findings and conclusions." *Ashland Sch. Dist. v. Parents of Student R.J.*, 588 F.3d 1004, 1008 (9th Cir. 2009). "At the same time, section 1415(*i*)(2)(C)'s mandate that 'the reviewing court "receive the records of the [state] administrative proceedings" carries with it the implied requirement that due weight shall be given to these proceedings.'" *Id.* (alteration in original) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982)). "Thus, the court must give deference to the state hearing officer's findings, particularly when they are thorough and careful, and avoid substituting its own notions of sound educational policy for those of the school authorities which it reviews." *Id.* at 1008–09 (cleaned up). A decision is "'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision containing a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (cleaned up).

### B. Issues Presented on Appeal

"As a general rule," in IDEA appeals, "arguments not raised at an administrative hearing cannot be raised for the first time on appeal to the district court." *Dep't of Educ. v. Leo W.*, 226 F. Supp. 3d 1081, 1096 (D. Haw. 2016) (internal quotation marks omitted). Additionally, the Ninth Circuit has held that review is specifically limited to issues raised in the administrative complaint. *See County of San Diego v. Cal. Special Educ. Hearing Off.*, 93 F.3d 1458, 1465 (9th Cir. 1996) ("The scope of the administrative hearing . . . is limited to the 'complaint' raised to obtain the hearing."); *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 451 (9th Cir. 2010) ("This Court lacks subject matter jurisdiction over claims Student failed to raise in the relevant administrative procedure.").

Plaintiff's administrative complaint includes only one and a half pages of factual allegations. (AR 7–8.) In relevant part, the administrative complaint states:

> A manifestation determination IEP meeting was held on 5/19/22. The District concluded that [C.D.'s] conduct was not a manifestation of his disability. The IEP team did not consider all relevant information that was available or part of [C.D.'s] records. Relevant information about [C.D.'s] conduct was not provided to the family. The District found that [C.D.'s] IEP was appropriate and was being properly implemented. Finally, the District concluded that [C.D.'s] behavior was not caused by, or did not have a direct and substantial relationship to his disability. He was removed from his IEP placement. [C.D.] challenges these finding [sic].

(*Id.*) The Complaint goes on to request: 1) "[a]n order that the incident was caused by or directly and substantially related to [C.D.'s] disability," 2) "[a]n Order that [C.D.'s] conduct was the direct result of a failure to assess, formulate or implement an appropriate IEP," 3) "[a]n Order that the discipline be rescinded and that [C.D.] be

allowed to return to school," and 4) "[a]dditional appropriate remedies in addition to the forgoing deemed appropriate by the Administrative Law Judge." (*Id.* at 8.)

In his trial brief, Plaintiff argues that members of the MD team did not review witness statements relevant to the MD decision. (Pl.'s Br. 16–22.) Plaintiff also argues that Defendant failed to provide C.D.'s parents with the written statements. (*Id.* at 23–24.) The ALJ determined that these allegations of "procedural defects" were "background" information and were not adequately pleaded as a claim for relief. (AR 783–84.) As a result, the ALJ concluded that any claims related to defects in the MD process were not properly raised as part of the administrative complaint. (*Id.*) The ALJ held that the dispute was limited to determining whether C.D.'s conduct on May 3, 2022, was: 1) caused by, or had a direct and substantial relationship to, C.D.'s disability, or 2) a direct result of Atascadero's failure to implement C.D.'s IEP. (*Id.* at 755.)

The ALJ's framing of the issues was proper. On June 28, 2022, Plaintiff filed a prehearing conference statement which identified only one issue: "Was Student's violation of the School Code of Conduct on 5/3/22 a manifestation of his disabilities, or a result of failure to implement his IEP?" (*Id.* at 62.) On July 1, 2022, the OAH "held a prehearing conference and the administrative law judge clarified the issue separating Student's issue into two issues" however the proposed framing "did not include any requests to determine procedural defects of the manifestation determination meeting." (*Id.* at 783; *see id.* at 85.) The ALJ ordered the parties to "file a written request for relief if the issues as stated in [the] Order [did] not reflect their understanding of the issues as clarified at the prehearing conference." (*Id.* at 85.) Plaintiff filed an objection to the ALJ's decision to bifurcate the issue but reiterated that the dispute was limited to whether C.D.'s "violation of the School Code of Conduct on 5/3/22 [was] a manifestation of his disabilities, or a result of failure to implement his IEP." (*Id.* at 100.) On the first day of the hearing, the ALJ discussed the proper framing of the issue, and Plaintiff agreed the issues were limited as stated above. (*Id.* at 855–60.) "At no time did [Plaintiff] raise procedural challenges associated with the manifestation

determination review meeting during the clarification of the issues at [the] hearing." (*Id.* at 784.) As a result, the record demonstrates that the ALJ properly considered all issues raised in the administrative complaint.

Plaintiff's argument that "[e]ven had this issue not been raised in the complaint, it was tried by consent and the OAH Decision should have addressed it on the merits" is without merit. (Pl.'s Br. 16.) Plaintiff cites *M.C. v. Antelope Valley Union High School District* for the proposition "that an issue 'tried by the parties' express or implied consent . . . must be treated in all respects as if raised in the pleadings.'" 858 F.3d 1189, 1196 (9th Cir. 2017) (quoting Fed. R. Civ. P. 15(b)(2)) (ellipsis in original). Plaintiff argues that during the hearing before the ALJ, "[e]xtensive evidence was presented about the witness statements and how they were never provided to C.D.'s parents or made available for the manifestation determination team members." (Pl.'s Br. 16.) "To establish implied consent, the plaintiff must demonstrate that the defendant understood evidence had been introduced to prove the new issue, and that the new issue had been directly addressed, not merely inferentially raised by incidental evidence." *In re Acequia, Inc.*, 34 F.3d 800, 814 (9th Cir. 1994) (cleaned up). "Failure to object to the admission of evidence on [an] unpleaded issue does not establish implied consent." *LaLonde v. Davis*, 879 F.2d 665, 667 (9th Cir. 1989). Additionally, "where evidence alleged to have shown implied consent was also relevant to the other issues at trial, it cannot be used to imply consent to try the unpleaded issue." *In re Acequia, Inc.*, 34 F.3d at 814 (cleaned up). Evidence concerning any procedural defects at the MD meeting was also relevant to determining whether the MD team properly concluded that C.D.'s conduct was not a manifestation of his disabilities. As a result, Plaintiff has not shown allegations of procedural failings at the MD hearing were "tired by consent." (Pl.'s Br. 16.)

Review on appeal here is therefore limited to determining whether C.D.'s conduct was caused by his disabilities, had a direct and substantial relationship to his disabilities, or was a result of Defendant's failure to implement his IEP.

### C. Plaintiff Has Stated a Live Cause of Action

Defendant argues that because the District rescinded C.D.'s expulsion and returned him to his previous placement, C.D. is in "exactly the same [status] as he would have been" if the MD decision "had already been overturned." (Def.'s Br. 6.) Defendant contends Plaintiff's claims are therefore moot. (*Id.* at 4–8.) "The jurisdiction of federal courts depends on the existence of a [live] 'case or controversy' under Article III of the Constitution." *M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 857 (9th Cir. 2014) (internal quotation marks omitted). "The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006). "That burden is 'heavy'; a case is not moot where *any* effective relief may be granted." *Id*.

Defendant relies on *M.M.*, 767 F.3d at 857–58, as support for the proposition that "[t]he sole fact the OAH Decision was unfavorable does not give rise to a claim of action." (Def.'s Br. 6.) While this is undoubtedly true, Plaintiff here is not simply seeking a declaration that the manifestation determination was incorrect. Plaintiff seeks "[a]n Order that Atascadero review, update and modify C.D.'s behavioral intervention plan and award him compensatory education."[3] (Pl.'s Reply 8 (internal quotation marks omitted); *see* Compl., Prayer for Relief ¶ 6.) To remedy an IDEA violation, district courts are authorized to order a school district to provide a plaintiff compensatory education. *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011). Because Plaintiff seeks a remedy that is within the power of this Court to grant, his claims are not moot.

---

[3] Although the requests for compensatory education and an order reviewing C.D.'s BIP are not specifically articulated in the administrative complaint, Plaintiff did request additional "remedies . . . deemed appropriate by the Administrative Law Judge." (AR 8.) Because the ALJ was empowered to order compensatory education and a review of C.D.'s BIP on the issues before her, the request was properly raised by the administrative complaint and may therefore be considered by this Court on appeal.

11

### D. The ALJ's Conclusions Are Entitled to Deference

The ALJ heard live testimony from multiple witnesses over seven days. (AR 754.) The ALJ's decision included a complete factual background and a discrete analysis supporting both her legal and factual conclusions. (*Id.* at 755–85.) Her decision was "thorough and careful" and thus entitled to deference. *R.B.*, 496 F.3d at 942 (internal quotation marks omitted). The Court also defers to the ALJ's determinations concerning witnesses credibility. As the official hearing live testimony, the ALJ was "in the best position to determine issues of credibility." *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 889 (9th Cir. 2001). Additionally, the ALJ offered specific explanations for her credibility determinations. (*See, e.g.*, AR 769–70 (articulating the factors that "negatively impacted" Dr. Randall Ball's "persuasiveness and the reliability of his opinions").)

Contrary to Plaintiff's argument, the ALJ did not ignore "that there was a lot of evidence that C.D. was agitated, frustrated and not using functional communication." (Pl.'s Br. 28.) The ALJ identified numerous instances where C.D. expressed agitation and hostility towards school officials. (*See* AR 761–64.) Nor did the ALJ ignore "C.D.'s extensive history, documented in school records of maladaptive behaviors." (Pl.'s Br. 27 (internal quotation marks omitted); *see* AR 759–60 (memorializing review of this history and summarizing C.D.'s previous behaviors).)

The ALJ's decision thoroughly addressed the contrary opinions of Dr. Randall Ball and C.D.'s mother. With respect to Dr. Ball, the ALJ found his "opinions were speculative and unreliable." (AR 769.) Although "Dr. Ball opined that Student's conduct likely was impulsive and his cognitive ability may have contributed to Student's behavior that day," the ALJ determined that contradictory testimony from other witnesses was more persuasive and reliable. (*Id.*; *see id* at 771.) The ALJ noted that Dr. Ball "couched his opinions with uncertainty using phrases such as 'probably,' 'may,' and 'likely,'" did not specifically question either C.D. or his parents concerning the May 3, 2022, incident, and "did not visit Atascadero High School to view the scene

of the incident, [did] not observe[] Student at Atascadero, and had no personal knowledge of Student's functioning" prior to the incident. (*Id.* at 769–70.) The Court agrees with Defendant's argument that "[c]ontrary to Plaintiff's misstatement that the ALJ demanded certainty from Dr. Ball, the ALJ's findings instead show that she gave thorough, careful explanations as to why Dr. Ball's testimony was speculative, unpersuasive, and unconvincing." (Def.'s Br. 11–12.)

The ALJ also concluded that testimony from C.D.'s mother "was unpersuasive because it lacked objectivity and reliability." (AR 772.) C.D.'s mother testified that she could not give a single example of C.D.'s maladaptive behavior that did not arise from one of his disabilities. (*Id.* at 2251.) The Ninth Circuit has recognized that one cannot reasonably conclude *all* behavior arises from a student's disabilities. *See Doe v. Maher*, 793 F.2d 1470, 1482 (9th Cir. 1986) ("When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules . . . . To do otherwise would amount to asserting that all acts of a handicapped child, both good and bad, are fairly attributable to his handicap. We know that that is not so."), *aff'd as modified sub nom. Honig v. Doe*, 484 U.S. 305 (1988).

The ALJ's decision was careful, thorough, and well-reasoned. The ALJ's "decision contain[ed] a complete factual background as well as a discrete analysis supporting the ultimate conclusions." *R.B.*, 496 F.3d at 942 (cleaned up). The ALJ's conclusions were reasonable and supported by evidence and live witness testimony. As a result, the ALJ's inferences drawn from the facts as well as her determinations concerning witness credibility are entitled to deference.

### E. C.D.'s Conduct Was Not Caused by His Disability, Nor Did C.D.'s Conduct Have a Substantial Relationship to His Disability

The ALJ correctly concluded that C.D.'s "conduct was not caused by" and did not have "a direct or substantial relationship to Student's cognitive functioning, processing, and ADHD." (AR 768.) Plaintiff states that his disabilities are characterized by "great difficulty inhibiting a thought or inhibiting acting on or

responding to a current thought or feeling in response to an external stimulus event or stimuli without consideration of past learning experiences or possible future outcomes." (Pl.'s Br. 28 (quoting Ball Decl. ¶ 6, ECF No. 25-3).) Plaintiff argues that his poor impulse control stemming from his disabilities "was a major contributing factor" on the day of the incident "in light of [his] anger and frustration." (*Id.* at 29.) Evidence and witness testimony, however, show that C.D.'s conduct was not the result of impulsive behavior.

Erik Mowinckel, the school psychologist, and the only psychologist to provide testimony, "spoke to the relationship between Student's conduct on May 3, 2022, and his disabilities, and testified that" C.D.'s conduct did not arise as a result of his ADHD or cognitive functioning. (AR 768, *see also id.* at 1317–24.) Mr. Mowinckel "explained that neither the interventions provided, nor the environmental circumstances would have resulted in Student's disabilities causing his physical aggression." (*Id.* at 768.) The record also shows that "[t]here were no intense antecedents likely to invoke [C.D.'s] physical aggression, and the aggression was unwarranted given Atascadero's interventions and the environmental circumstances that day." (*Id.* at 768, 1526–27.) Additionally, the incidents for which C.D. was disciplined were separated by a period that gave C.D. sufficient "time to make a choice about what behavior he wanted to do." (*Id.* at 1551.) School staff accompanied C.D. "for a distance" from "the construction area next to the administrator's office, and then into office in the administration area." (*Id.*) C.D. "could have engaged in aggression at any point in time during that distance," but "he waited until [Ms. Allison] was not present before engaging in" aggressive behavior. (*Id.*) Because C.D. did not appear to have difficulty controlling his behavior after he began walking to the nurse's office, it is reasonable to conclude his conduct was "a choice rather than a challenge with control of behavior." (*Id.* at 1552.)

Other witness testimony shows that C.D. used functional communication to achieve his goal of being "able to remain in a[n] unsafe construction area." (*Id.* at 1323.) Functional language is evidence of C.D.'s "cognitive understanding as well as his

receptive and expressive processing of what was going on." (*Id.* at 773.) For example, in response to Ms. Steck's request that C.D. move away from the construction site, C.D. communicated that he was refusing to comply and that he felt he was safe. (*Id.* at 1570.) C.D. also put on his glasses to demonstrate that he was aware the flying debris could hurt his eyes. (*Id.* at 302, 1541–42.) Further, in response to Ms. Hale's statements that it looked like something was bothering C.D., he used functional language to communicate that he was not upset, that he was refusing to leave the construction area, and that he felt he was safe. (*Id.* at 302, 1318.)

Given C.D.'s repeated use of functional language, it is more likely than not that C.D. engaged in deliberative planning in response to not being allowed to remain near the construction site. This conclusion is again further supported by the fact that C.D. "waited until there was a point on when the preferred staff was not present, before he engaged in behavior that was subjected to discipline." (*Id.* at 1323.) As the ALJ noted, this is evidence that C.D. "knew what he was doing and how to differentiate between preferred and non-preferred staff." (*Id.* at 769.) Accordingly, the Court agrees with the ALJ in concluding that C.D.'s "physical aggression toward [Ms.] Hale was not impulsive, and Student processed the situation and understood it." (*Id.* at 772.) Plaintiff has not met his burden of showing his conduct was attributable to "poor impulse control, which is a primary symptom for ADHD," or his cognitive abilities. (Ball Decl. ¶ 6.)

Nor does the record establish that C.D.'s conduct was a result of his speech and language processing abilities. Although individuals with speech language impairments can experience "frustration" arising from "difficulty understanding language and using language for communication," C.D.'s use of functional language indicated "he understood what staff were telling him." (AR 1534.) Additionally, Atascadero's speech and language pathologist Samuel Weber also testified that C.D. was capable of processing the language and information throughout the incident. (*Id.* at 1774–77.) Specifically, Mr. Weber testified that C.D. was "given short directives to stop doing what he was doing at certain times or to return to class" and that "linguistically he is

able to process that type of information from [a] receptive language perspective." (*Id.* at 1775.) As the ALJ concluded, Mr. "Weber's testimony withstood cross-examination and was not challenged by another speech and language pathologist." (*Id.* at 773.) Although Dr. Ball disagreed with Mr. Weber's conclusions, Dr. Ball's testimony is entitled to less weight for the reasons articulated in the ALJ's decision. As a result, Plaintiff failed to establish that his conduct arose from his speech and language deficits.

Upon an independent review of the record, as well as an evaluation of the record affording the deference owed to the ALJ's opinion, the Court finds that the weight of the evidence fails to show C.D.'s conduct was caused by, or had a substantial relationship to, his disabilities.

**E. C.D.'s Conduct Was Not the Direct Result of Defendant's Failure to Implement C.D.'s IEP**

Plaintiff does not argue that C.D.'s conduct was the direct result of Defendant's failure to implement his IEP. (*See generally* Pl.'s Br.) By failing to address this issue, Plaintiff has waived any such argument. *See Aplin v. MCIJ*, 800 F. App'x 590, 591 (9th Cir. 2020). As a result, Plaintiff has not shown by a preponderance of the evidence C.D.'s conduct was caused by the failure to implement C.D.'s IEP.

Even if Plaintiff had made such an argument, an evaluation of the record shows the District complied with C.D.'s IEP both before and during the May 3, 2022, incidents. All of the District witnesses who were present testified that the incidents were not the result of a failure to implement C.D.'s IEP. (AR 1015, 1325, 1574, 1732, 1773, 1776.) Ms. Hale testified that the necessary accommodations and services were provided prior to the May 3, 2022, incident. (*Id.* at 1458–76.) These included minimizing transitions, access to breaks, modification of assignments, reinforcement tools, and BCBA consultation.[4] (*Id.*)

---

[4] Although the ALJ concluded that Plaintiff established the District failed to provide the number of BCBA consultation hours required under C.D.'s IEP, (AR 776), only

Nor is there evidence to conclude that Defendant failed to implement C.D.'s BIP during the incidents. C.D.'s BIP included procedures to address inappropriate conduct "such as off task behavior, verbal aggression, physical aggression, and elopement." (*Id.* at 777, 1437–38.) Atascadero staff used a color coded "tracking system that delineated specific procedures for staff to take when" C.D. exhibited certain behavior. (*Id.* at 777.) Under C.D.'s BIP, if he was exhibiting "red" behavior he was to "be given an empathic response and a reminder that a change of behavior can earn him tallies for being green," as well as "immediate feedback that he is exhibiting red behavior." (*Id.*) Under C.D.'s BIP, if he is "red" he "should not be given any further directives or attention and appropriate support should be notified. Staff should keep distance until Student deescalates." (*Id.*)

Ms. Allison testified that staff were appropriately trained regarding the implementation of C.D.'s BIP. (*Id.* at 1703–07.) Every witness who testified and was present on May 3, 2022, stated that C.D.'s BIP was implemented throughout the incidents. (*Id.* at 1016, 1114–15, 1325, 1729–30.) C.D. was repeatedly provided with an empathetic response, C.D. was given immediate feedback that he was exhibiting "red" behavior, the appropriate staff were notified when C.D. refused to return to class after lunch, and staff kept their distance throughout. (*See, e.g.*, *id.* at 298.)

---

*material* failures to implement a student's IEP constitute a breach of the IDEA, *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007). "A material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* Stated differently, "[t]here is no statutory requirement of perfect adherence to the IEP, nor any reason rooted in the statutory text to view minor implementation failures as denials of a free appropriate public education." *Id.* at 821. Although C.D.'s mother and Dr. Ball testified they believed the failure to provide the requisite number of BCBA consultation hours resulted in C.D.'s conduct, the ALJ properly discounted the weight of their testimony. As noted in the ALJ's decision, both witnesses "maintained that more BCBA minutes would have allowed for more direct BCBA consultation but gave no specific explanation as to why this failure directly resulted in Student's May 3, 2022 physical aggression on [Ms.] Hale." (AR 776.)

To the extent C.D. was reengaged while he was near the construction site, flying debris rendered the situation unsafe, and staff appropriately followed the nonviolent crisis intervention procedures. (*Id.* at 1497.) The record also fails to explain how C.D.'s pinning of Ms. Hale against a wall with his backpack could have been caused by Defendant's failure to comply with C.D.'s BIP. "No evidence established that [Ms.] Hale's behavior or behavior of other staff from the time at the construction site until the backpack incident, was in violation of Student's BIP." (*Id.* at 780–81.)

## III. CONCLUSION

Upon an independent review of the record, and in light of the deference owed to the ALJ's decision, the Court concludes Plaintiff has not established that C.D.'s conduct was caused by, or had a direct and substantial relationship to, C.D.'s disability. Nor has Plaintiff shown that C.D.'s conduct was a direct result of Atascadero's failure to implement C.D.'s IEP. Accordingly, the Court finds in favor of Defendant. The Court will issue a separate judgment.

**IT IS SO ORDERED.**

Dated: June 5, 2023

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE